UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


MID-STATE SURETY CORPORATION

     Plaintiff

v.                             Civil Action No.: 2:05-0072

DIVERSIFIED ENTERPRISE, INC. and
INTERNATIONAL FIDELITY
INSURANCE COMPANY

     Defendants



AMENDED MEMORANDUM OPINION AND ORDER[1]


     Pending before the court is the motion of plaintiff Mid-State Surety Corporation ("Mid-State"), filed September 30, 2005, seeking summary judgment.

---

[1]This order amends the court's previous memorandum opinion and order entered December 8, 2005, which granted in part and denied in part Mid-State's motion for summary judgment. The resulted is unaffected. The amended portions of the order can be found on page 2 (changing March of 2000 to March of 2002) and pages 13 and 14 (eliminating from the first order the last three lines on page 13 and the first four lines and the footnote on page 14).

1

I.


        This action arises out of the construction of a water
treatment facility near Naugatuck in Mingo County.  (Am. Compl. ¶
8.)  In July of 2000, Mingo County Public Service District ("the
District") entered into a contract with Holley Brothers
("Holley"), in which Holley agreed to construct and complete a
water treatment plant for the District in exchange for
$5,900,000.  (Id.)  The plant was designed by Thrasher
Engineering, Inc. ("Thrasher").  Thrasher also provided
construction administration services and resident project
inspection services to the District, including review and
inspection of work by the contractor, preparation of lists of
work to be completed ("punch lists"), and issuance of
certificates of substantial and final completion of the project.
(Def.'s Resp. Memo. 1.)  Mid-State served as surety on the
project and issued a performance bond on behalf of Holley to the
District. (Am. Compl. ¶ 9.)

        Around March of 2002, Holley was declared to be in
default of the contract and was terminated for cause.  (Id. ¶
10.)  Pursuant to the performance bond, Mid-State entered into an
agreement to take over and complete the construction of the

                                2

project.  (<u>Id.</u>)  Mid-State, through its consultant, Robert Gentle,
solicited bids from several contractors, including defendant
Diversified Enterprises, Inc. ("Diversified"), whose owner, Jack
Whittaker, had been employed with Holley and worked on the
project.  (Pl.'s Memo. 2; Def.'s Memo. 2)  On August 5, 2002,
Mid-State and Diversified entered into a completion agreement
whereby Diversified would perform the uncompleted work on the
project for $1,751,758.  (Pl.'s Memo. 2-3.)

            Under the contract, Diversified was to complete all
work by February 3, 2003.  (<u>Id.</u> 3.)  To the extent Diversified
failed to do so, it assumed liability under the contract for $500
per day in liquidated damages.  (<u>Id.</u>)  It is Mid-State's position
that Diversified failed to complete the project by February 2003.
(<u>Id.</u> 3-4.)

            On August 3, 2004, Mid-State filed a complaint in this
court asserting claims against Thrasher and the District.[2]   Ten
days later, on August 13, 2004, the District instituted an action
in the Circuit Court of Mingo County against Mid-State and
Diversified seeking $1 million in actual damages, over $450,000

_____

            [2]The related action is styled <u>Mid-State Surety Company v.
Mingo County Public Service District, et al.</u>, Civil Action No.:
2:04-813.

                                    3

in liquidated damages, and punitive damages.  (Am. Compl. ¶¶ 13,

15.)  In January of 2005, Mid-State and the District entered into

a settlement agreement whereby Mid-State forfeited to the

District $600,000 of the remaining $627,000 balance of the

contract. (Id. ¶ 17.)  Pursuant to the settlement agreement, the

District was voluntarily dismissed with prejudice from the

federal action, Mid-State was dismissed with prejudice in the

state court action, and Diversified was dismissed without

prejudice in the state court action.  (Agreed Dismissal Order;

Pl.'s Memo. 5.)   Diversified, while participating in settlement

discussions, did not contribute to the settlement.[3] (Pl.'s Memo

5.)

On January 26, 2005, Mid-State instituted this action

against Diversified.  On February 8, 2005, Mid-State filed an

amended complaint naming International Fidelity Insurance Company

("Fidelity"), the surety to Diversified, as an additional

---

[3]Mid-State's claims against Thrasher were not dismissed in
the federal action before this court.  Those claims include
breach of contract, negligent design and administration of the
project, and misfeasance.  Thrasher subsequently filed a third
party complaint seeking indemnity and/or contribution from
Diversified.  Diversified then counterclaimed, alleging Thrasher
was negligent in its design and performance of administration
services.  Oddly, Diversified's counterclaim against Thrasher was
not asserted until more than 5 months after Thrasher filed its
complaint against Diversified and six weeks beyond the close of
discovery.

defendant. (Am. Compl. ¶ 3.)  In the amended complaint, Count I asserts Diversified breached the completion agreement. (Id. ¶¶ 22-24.)  Count II maintains Diversified owes Mid-State a contractual and common law duty of indemnification.  (Id. ¶¶ 25-28.)  Count III asks the court to declare that Mid-State fulfilled all of its obligations under the completion agreement and Diversified materially breached the completion agreement. (Id. ¶¶ 29,30.)  Counts IV through VI assert breach of contract, breach of fiduciary duty, breach of covenants of faithful performance, and bad faith claims against Fidelity.[4] (Id. ¶¶ 31-39.)  Accordingly, Mid-State seeks to recover the $600,000 forfeited by Mid-State to the District plus interest, costs, and fees. (Id.)

Diversified denied the allegations in Mid-State's complaint and responded with a counterclaim.  (Def.'s Memo. 4-5.) Count I of the counterclaim alleges Mid-State breached the completion agreement by failing to pay Diversified approximately $1.42 million.  (Counterclaim ¶¶ 9-10.)  Alternatively, Count II asserts Diversified is entitled to recover the $1.42 million under a quantum merit theory. (Id. ¶¶ 10-18.)

---

[4]Pursuant to a stipulated dismissal order, the bad faith claims against Fidelity were dismissed without prejudice on March 16, 2005.

5

On September 30, 2005, Mid-State moved for entry of summary judgment.  In its motion, Mid-State asserts it is entitled to summary judgment in its favor on the breach of contract and indemnity claims against Diversified.  Furthermore, Mid-State seeks dismissal of Diversified's counterclaim in its entirety.[5]

II.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a

_____

[5]Mid-State does not seek summary judgment on its damages, as it asserts damages continue to accrue under the indemnification provision of the completion agreement for attorney fees, costs, and consultant fees.

verdict for the non-movant. Id.  The moving party has the burden
of showing there is an absence of evidence to support the
nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317,
325 (1986).  If the movant satisfies this burden, then the non-
movant must set forth specific facts as would be admissible in
evidence that demonstrate the existence of a genuine issue of
fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party
is entitled to summary judgment if the record as a whole could
not lead a rational trier of fact to find in favor of the non-
moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir.
1991).

        Conversely, summary judgment is not appropriate if the
evidence is sufficient for a reasonable fact-finder to return a
verdict in favor of the non-moving party.  Anderson, 477 U.S. at
248.  Even if there is no dispute as to the evidentiary facts,
summary judgment is also not appropriate where the ultimate
factual conclusions to be drawn are in dispute.  Overstreet v.
Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

        In reviewing the evidence, a court must neither resolve
disputed facts or weigh the evidence, Russell v. Microdyne Corp.,
65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of
credibility.  Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir.

7

1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Regarding contract cases specifically, our court of appeals has observed the matter of "interpretation is a subject particularly suited for summary judgment . . . ."  Bank of Montreal v. Signet Bank, 193 F.3d 818, 835 (4th Cir. 1999).  It has also been observed repeatedly, however, that "[a]n ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact . . . [and] summary judgment is inappropriate."  Sempione v. Provident Bank, 75 F.3d 951, 959 (4th Cir. 1996).  Expanding upon this analysis, the court of appeals has observed:

> A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if "susceptible to two reasonable interpretations." American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (1965). The first step for a court asked to grant summary judgment based on a contract's

8

interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. <u>See</u> <u>Jaftex Corp. v. Aetna Casualty and Surety Co.</u>, 617 F.2d 1062, 1063 (4th Cir.1980). If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact. <u>World-Wide Rights Ltd. Partnership v. Combe Inc.</u>, 955 F.2d 242, 245 (4th Cir.1992).

<u>Goodman v. Resolution Trust Corp.</u>, 7 F.3d 1123, *1126 (4th Cir. 1993). The court of appeals has also observed:

"Only an unambiguous writing justifie[s] summary judgment, and no writing is unambiguous if 'susceptible of two reasonable interpretations.' . . . <u>If there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact</u>." 605 F.2d at 726

<u>Atalla v. Abdul-Baki</u>, 976 F.2d 189, 192 (4th Cir. 1992) (emphasis added) (quoting <u>Bear Brand Hosiery Co. v. Tights, Inc.</u>, 605 F.2d 723, 726 (4th Cir. 1979) (quoting <u>American Fidelity & Cas. Co. v. London & Edinburgh Ins. Co.</u>, 354 F.2d 214, 216 (4th Cir. 1965)).

9

III.

A.    Breach of Contract and Indemnity Claims

In support of its argument for summary judgment on the breach of contract claim, Mid-State relies on Term 2 of the completion agreement, which provides in relevant part

> Contractor undertakes and agrees to perform all of the work and other responsibilities required of Holley under and by virtue of the terms of the contract, just as though contractor had been the contractor under the contract in the first instance, strictly in accordance with the terms and provisions of the contract and those documents incorporated therein, so as to complete the work and other responsibilities under the contract and so as to gain acceptance thereof by the owner.

(Completion Agreement, attached as Ex. A to Pl.'s Memo.)  Mid-State argues that, because Diversified failed to complete the work, Diversified has a resulting indemnity obligation under Term 7 of the agreement, which provides in relevant part:

> Contractor shall indemnify and save harmless surety from and against all liability, damages, loss, costs and expenses which surety may sustain or incur in consequence of any act, omission or default of contractor in performance of the work under the contract and this agreement.

(Id.)  In support of their indemnity claim, Mid-State notes that Thrasher and the District had issued a number of punch lists beyond the completion date of February 5, 2003, which identified

10

work yet to be completed by Diversified. Further, Mid-State contends that the $600,000 settlement with the District was reasonable, and, therefore, Mid-State is entitled to recover this sum under the indemnity provision.

Diversified responds that (1) it addressed punch list items in a timely and workmanlike manner, (2) Thrasher and the District acted arbitrarily in determining whether Diversified's work was satisfactorily completed, (3) Diversified satisfactorily completed the project under the completion agreement, (4) any delay in completion of the project was the result of Thrasher's faulty design and negligent oversight, and (5) Mid-State cannot demonstrate the $600,000 settlement with the District was reasonable.

The evidence reveals questions of fact remain as to (1) whether Diversified satisfactorily completed the project, (2) whether Thrasher and the District acted arbitrarily in determining whether Diversified's work was satisfactorily completed, and (3) whether any failure of Diversified to complete the project was the result of the alleged negligence of Thrasher.

Evidence exists from which a jury could infer that Diversified satisfactorily completed the project. According to

Diversified, the plant was ready to sell water in January of 2003, and a substantial completion punch list was requested and provided about that time. (Scott Dep. 25.)  The items on this punch list were completed, and the plant was approved for operation by the West Virginia Health Department on January 22, 2003.  (Scott Dep. 25; Smith email, attached as Ex. 14 to Def's Resp.)  Also, the president and owner of Diversified testified that "we did everything we were supposed to do before we called for the inspection and they started selling water." (Whittaker Dep. 94.)  While Diversified concedes that items from later punch lists remained beyond the February completion date, Gale Smith, an engineer for Diversified, in a letter dated February 27, 2003, indicated to the District that none of the punch list items precluded operation of the plant or affected the District's ability to supply water to the public.  (Smith email, attached as Ex. 7 to Def.'s Resp.)  Even Mid-State concedes in its brief that in February of 2003 Diversified finished the plant sufficiently for the District to take possession and sell water.  Given this evidence, questions of fact remain as to whether Diversified satisfactorily completed the project.

Moreover, while a certificate of final completion was not issued, Diversified does contend that Thrasher and the

12

District acted arbitrarily in determining whether Diversified's work was satisfactorily completed.  Under West Virginia law, a party can avoid a certificate of an architect or engineer made conclusive by the terms of the contract, if it can demonstrate that the decision was capricious, arbitrary, or without reason. Berry v. Huntington Masonic Temple Ass'n, 93 S.E. 55 (W. Va. 1917).  Inasmuch as Diversified has produced evidence that it satisfactorily completed the project, questions of fact remain as to whether Thrasher or the District acted capriciously, arbitrarily, or without reason in determining whether Diversified's work was satisfactorily completed.

Further, even if a jury were to find that Diversified had failed to complete the project, questions of fact remain as to whether that failure was the fault of Diversified.  Under the indemnification agreement, Diversified did not agree to indemnify Mid-State from liability for Thrasher's negligence.  See Term 7, supra.  Diversified contends in its counterclaim in the related action that Thrasher negligently designed the project and failed to provide timely direction in its oversight capacity. (Counterclaim ¶ 9-18.)  In support, Mr. Whittaker, the president of Diversified, testified that 90% of the problems were the fault of Thrasher's engineer.  (Whittaker Dep. 54.)  Additionally, the

13

record is replete with communications from Diversified indicating that Thrasher was dilatory in providing Diversified with punch lists and oversight. (Exs. 6, 7, 10, 13, 14 of Def.'s Resp.) Accordingly, the court finds the alleged negligence of Thrasher remains a question of fact, which precludes judgment as a matter of law.

Inasmuch as numerous questions of fact remain surrounding Diversified's liability under the contract, the reasonableness of Mid-State's settlement with the District cannot be assessed on this motion for summary judgment.

B.  **Diversified's Counterclaim**

In their counterclaim, Diversified asserts they are entitled to approximately $1.42 million under a breach of contract theory or, alternatively, a quantum meruit theory.  In their response, Diversified itemizes this claim as being in the amount of $1,410,379, identifying the three categories of items that comprise this figure: (1) the balance owed under the completion agreement to Mid-State, which is $91,588; (2) "as built" summary sheet costs, which amount to $981,136; and (3) flood repair work and repair of work of Holley, which amount to $337,655.

14

Mid-State contends the entirety of Diversified's counterclaim should be dismissed on a number of theories.  First, Mid-State alleges that Diversified's Rule 30(b)(6) corporate representative, Jack Whittaker, failed to explain in his deposition how the numbers of $981,136 or $337,655 were derived and, therefore, those claims should be dismissed.  Second, Mid-State contends the $981,136 claim should be dismissed as it is contrary to the express terms of the completion agreement or, alternatively, a disfavored "total cost" claim.  Third, Mid-State asserts that Diversified is not entitled to the contract balance of $91,588 because it did not complete the project.  Fourth, Mid-State contends that Count II of Diversified's counterclaim, which seeks recovery under a quantum meruit theory, should be dismissed as it seeks recovery based on a purported implied contract when there is an express contract governing the parties' relationship.

i.      <u>Diversified's Claim for the Contract Balance</u>

Inasmuch as questions of fact remain as to whether Diversified satisfactorily completed the project, Diversified's claim for the contract balance cannot be resolved on motion for summary judgment.

ii.      <u>Diversified's Claim for Flood Repairs and Repair of</u>

15

## Holley Work

Diversified is seeking $337,655 for flood repairs and the repair of work done by Holley.  Diversified notes that it billed Mid-State $33,875 for repairs of flood damage and the repair of Holley work, and it received payment in that amount.[6] However, Diversified contends this amount was only for "flood work on the first part of the job" and that the work was incorrectly billed under the completion agreement.  (Whittaker Dep. 152-53.)  Diversified's position is that it is entitled to recover for all flood and repair work done before and after the invoice, at the contractual rate of $210 per hour, plus the cost of material.  Diversified's claim for remedial and flood repair work appears to be supported under the contract.

Term 1 of the completion agreement reads in relevant part,

---

[6]Diversified's brief represents the billed amount to be only $33,000; however, both the invoice contained in Exhibit 63 and Mr. Whittaker's testimony indicate the amount billed to be $33,875.  Furthermore, Diversified asserts that the amount due for flood repair and repair of Holley work is $337,655.  In their schedule of damages Diversified notes that it has not deducted $33,875 from the alleged amount of $337,655, because Mid-State was given credit for this payment against the contract as an amount received by Diversified.  Accordingly, if the payment were applied to flood and Holley repair work, the amount Diversified is seeking for the unpaid balance of the contract ($91,588) would increase by $33,875.

16

> In the event the Owner or its representative
> rejects any of the work performed by Holley, the
> Contractor agrees to promptly notify Surety of
> such rejection and agrees to perform such
> remedial work or replace such materials as are
> necessary to make such defective or rejected work
> or materials conform with The Contract or
> otherwise be acceptable to Owner.  As to this
> work, contractor will bill $210.00 per hour, plus
> materials against a $50,000 allowance provision
> for this remedial work, which is included in the
> lump sum bid amount.

(Completion Agreement, attached as Ex. A to Pl.'s Memo.)

(emphasis provided).  Term 3 of the completion agreement

addresses extra work under the contract and contains the

following handwritten provision inserted at the end of the term:

> Note: All items to be corrected will be billed at
> $210.00 per hour plus (+) cost of material.  This
> includes flood damage items.

(Id.)[7]  Also, Term 14 of the contract contains a similar

handwritten provision, which provides,

> Diversified will be paid $210.00 per hour +
> material cost for all repairs of Holley's work,
> including retesting of work as required.

(Id.)[8]  Diversified contends that under Terms 3 and 14, it is

_____

[7]The letters "BMB" appear under the handwritten term and
appear to represent the assent of B. Michael Bowen, a claims
manager for Mid-State.  Bowen signed the completion agreement on
behalf of Mid-State.

[8]Term 14, addresses the contractor's duty to maintain
records to evidence any claims. Like Term 3, Term 14 also has the

17

entitled to recover $210 per hour plus cost of materials for the repair of Holley work and total flood repairs.  Unsuprisingly, Mid-State does not appear to contest Diversified's contractual entitlement to remedial and flood repair work under the contract. As a contractual basis exists for Diversified's claim for remedial and flood repair work, it cannot be denied as a matter of law.

iii.    <u>Diversified's claim for summary sheet costs</u>

By letter dated July 2, 2002, Mid-State provided Diversified with a list that showed items needed to complete the project in an amount of $314,143.  This list later became Exhibit B of the Completion agreement titled "Summary Sheet Costs." According to Diversified, it incurred $1,295,279 in "as built" summary sheet costs.[9]  From this figure, Diversified subtracts

---

initials "BMB" written underneath the provision.

[9]According to the schedule of damages sought by Diversified, the costs are as follows:

| | | |
|---|---|---|
| Subcontractor | $ | 217,317.63 |
| Utilities | | 10,437.58 |
| Parts & Repairs | | 61,091.57 |
| Materials | | 659,953.38 |
| Legal & Attorney Fees | | 5,500.00 |
| Rent | | 11,182.19 |
| Subtotal | | 966,411.12 |
| Overhead (34% of cost) | | 328,867.88 |
| Total Costs | $ | 1,295,279.00 |

18

the "as bid" summary sheet costs, which amount to $314,143, to

arrive at its claim for $981,136.  Accordingly, it is

Diversified's position that any additional equipment or materials

beyond what was listed on Exhibit B were the responsibility of

Mid-State.  (Whittaker Dep. 180.)  In their response Diversified,

does not identify the contractual basis for this claim but argues

it has a "legitimate counterclaim against Mid-State for damages

for extra work and materials" and can recover under a quantum

meruit theory.  Diversified further contends that the summary

sheet costs were not calculated under the total cost method, but

are calculated using the actual, historical cost records for the

project.

     The court finds Diversified's claim for $981,136 to be

contrary to the unambiguous terms of the completion agreement.

Under West Virginia law where the terms of a contract are clear

and unambiguous, they must be applied and not construed.  Orteza

v. Monongalia County General Hosp., 315 S.E.2d 40, 43 (W. Va.

1984).  Pursuant to Term 10 of the completion agreement,

Diversified was to provide all labor and materials to complete

the project for a lump sum price of $1,751,758.  (Pl's Ex. A,

Completion Agreement.)  Furthermore, in Diversified's letter

dated July 12, 2002, in which it submitted its bid of $1,751,758,

there is no reference to any cap in this figure.  (Id., Appendix
I p. 1 of 8.)  Also incorporated into the completion agreement by
reference is a letter dated July 12, 2002, from Robert Gentle to
Michael Bowen of Mid-State stating, "You will note the quote [for
completion of the project] is in the amount of $1,751,758.  This
quote includes all labor and material forward to complete the
job."[10]  (Id.)  Additionally, the parties clearly knew how to
provide for an allowance as they did so in Term 1 of the
Agreement; however, the completion agreement did not set forth an
allowance or cap for the items for which Diversified is now
seeking recovery. Finally, the $314,130 figure, incorporated into
the completion agreement, is provided on a document that is
identified only as a "Summary Sheet of Costs to be Added" and
there is no support anywhere in the completion agreement for the
suggestion that Exhibit B was to operate as cap on those costs.

        The only provision in the completion agreement that

_____

        [10]The letter goes on to state, "By copy of this letter, Jack
Whitaker [sic] is to review and affirm these things, and if I
have misstated anything, a prompt written understanding needs to
be forthcoming.  If all is in accordance with our understanding,
I ask Jack Whitaker [sic] to initial this letter as affirmed, and
forward it by facsimile to my office at his earliest
convenience."  A copy of this letter, attached to Ex. A of the
Completion Agreement and provided to the court by Mid-State as an
attachment to their motion, does not bear the signature of Mr.
Whittaker.  However, at his deposition, Mr. Whittaker
acknowledged that he signed the letter. (Whittaker Dep. 61.)

could support Diversified's $981,136 claim is Term 3, which
addresses the procedure under which Diversified could recover for
change order work, extra work or bulletin work.  Term 3 provides,

> Any change order work, extra work or bulletin
> work in addition to that work presently required
> by The Contract shall be agreed upon by the Owner
> and Contractor, presented to Surety for approval
> and signature, and Contractor shall receive in
> addition to the sum to be paid under paragraph 10
> hereof no more than the compensation agreed upon
> by the Owner and Contractor for performing such
> change order work, extra work or bulletin work,
> which sum shall be added to the sum to be paid by
> Owner to Surety under The Contract. No change
> order which reduces the sum to be paid by the
> Owner under The Contract shall be effective
> without the express written consent of Surety.

(Completion Agreement, attached as Ex. A to Pl.'s Memo.) As the
provision makes clear, in order for the contractor to recover for
the work, it must have been agreed upon by the owner and the
contractor, and presented to the surety for approval and
signature.  However, Whittaker conceded that the entirety of the
$981,136 claim was never billed to Mid-State. (Dep. Whittaker
180-81.)  Given this testimony, it appears Diversified's claim
was derived only after Mid-State instituted this action and not
in compliance with the requirement contained in Term 3.[11]  See

_____

[11]Oddly, when questioned about the $981,136 claim, Whittaker
testified that "any labor costs that was done on Holley's work is
included in when we went down there in this claim, in that
$1,295,000." (Dep. Whittaker 149.)  Moreover, Whittaker testified

<u>McKeny Const. Co., Inc. v. Town of Rowlesburg</u>, 420 S.E.2d 281, 284 (W. Va. 1992) (holding owner entitled to summary judgment on contractor's claim for extra work where contractor failed to comply with contract's unambiguous requirement it submit written notice in advance of such work.)

Diversified has provided no support for a contrary interpretation of the completion agreement other than reciting that they have a legitimate counterclaim for extra work and materials.  Indeed, the only support for Diversified's claim comes from Whittaker's testimony that it was his understanding that the costs listed in Exhibit B operated as a cap on Diversified's expenses for materials.  However, Diversified has failed to identify any provision in the contract that would support this interpretation, and given the language cited <u>supra</u>, such an interpretation is contrary to the unambiguous terms of the completion agreement.

Inasmuch as the unambiguous terms of the contract

---

that the $981,136 claim included fees and costs associated with checking the equipment for flood damage, and items that had to be sent back and replaced because they were damaged by the flood. (<u>Id.</u> 167-68.)  It is not clear from the record why these items were not included in the $337,855 claim for remedial and flood work or, if in fact they were included in the $337,855 claim and Whittaker simply misspoke.

support Mid-State's interpretation, and inasmuch further as Diversified has both failed to identify any contractual provision under which it could recover its $981,136 claim and has failed to conform with the only provision under which it could arguably recover for the work, summary judgment is appropriate with respect to Diversified's $981,136 claim for summary sheet costs.

Furthermore, Diversified's argument that it is entitled to recover the $981,136 under a quantum meruit theory can be disposed of summarily as it is well accepted that an implied contract and an express one covering the identical subject matter cannot exist at the same time.  <u>Rosenbaum v. Price Constr. Co.</u>, 184 S.E. 261, 263 (W. Va. 1936).  In this case, the completion agreement, by reference, expressly provides that the quote was to include all labor and material and makes no provision for an allowance or cap in that number for any of the items for which Diversified now seeks recovery.  Diversified cannot now seek to recover under an implied contract theory, when such recovery would be contrary to the express terms of the agreement.

iv.     <u>Diversified's alleged failure to comply with Rule 30(b)(6)</u>

Pursuant to Rule 30(b)(6), on July 8, 2005, Mid-State requested that Diversified designate a corporate representative

23

to testify at deposition regarding Diversified's bid, Diversified's total costs on the project, Diversified's damage claims, the negotiation of the completion agreement, and the terms of the completion agreement.  Diversified designated its president and owner, Jack Whittaker, as its corporate representative.

The deposition of Whittaker was held on August 26, 2005, at which Mid-State asserts Whittaker was unable to explain the calculation underlying the claims for $981,136 in summary sheet costs and the $337,655 claim for flood repairs and repairs of Holley work.  Mid-State contends that under Rule 30(b)(6), the failure of a corporation to provide an informed witness on a requested area of inquiry constitutes grounds for summary judgment.  Mid-State's argument is without merit.

As Diversified's claim for summary sheet costs has already been dismissed, the court will address Mid-State's argument only with respect to the $337,655 claim for flood repair and repair of Holley work.   Mid-State cites Rainey v. American Forest and Paper Association, Inc., 26 F. Supp.2d 82, 94 (D. D.C. 1998) for the proposition that the failure of a corporation to provide an educated witness on a requested area of inquiry constitutes grounds for summary judgment.  In Rainey, the

24

defendant corporation sought to introduce an affidavit, in
opposition to plaintiff's motion for summary judgment, that was
inconsistent with the testimony of the corporation's 30(b)(6)
representative.  Id. 93-94.  In excluding the evidence and
granting summary judgment, the court noted that, "[u]nless it can
prove that the information was not known or was inaccessible, a
corporation cannot later proffer new or different allegations
that could have been made at the time of the 30(b)(6)
deposition."  Id. 95.  Contrary to plaintiff's assertion, Rainey
does not stand for the proposition that the failure of a
corporation to provide an educated witness is, in and of itself,
grounds for summary judgment.

        Alternatively, Mid-State appears to suggest that under
Rainey, it is entitled to summary judgment as any evidence of
Diversified's claim could not later be proffered at trial as Mid-
State could not prove the evidence was not known nor inaccessible
at the time of the 30(b)(6) deposition.  Under this argument,
Diversified's claim for damages should be dismissed because
Diversified would be unable to provide sufficient evidentiary
support for its damages claim.   Although Whittaker did not
provide much detail surrounding this claim, he did explain, in
general terms, that he originally under-billed his claim for

25

remedial and flood damage work and was now seeking compensation based on the contractual amount of $210 per hour plus the cost of materials.  (Whittaker Dep. 153-54.)  Moreover, the information regarding the claims appears to have been inaccessible at the time of Whittaker's deposition as the cost sheets were in Virginia.  While it would have been helpful if Whittaker would have provided more detail surrounding the costs at his deposition, this is not the case, as it was in <u>Rainey</u>, where a corporation was trying to avoid summary judgment by introducing new evidence that was clearly contrary to the testimony of its 30(b)(6) representative.  In view of Whittaker's general explanation of the claim, and the seemingly innocent failure of Whittaker to provide a more detailed explanation, summary judgment is not warranted under 30(b)(6).

## IV.

        Based on the foregoing, the court ORDERS that plaintiff Mid-State's motion for summary judgment be, and hereby is, granted on Diversified's claim for summary sheet costs and Diversified's quantum meruit theory asserted under Count II of its counterclaim.  The court ORDERS that the motion be, and the same hereby is, denied in all other respects.  The parties shall

26

each bear its own costs associated with this motion.

        The Clerk is directed to forward copies of this

memorandum opinion and order to all counsel of record.

                              DATED: December 12, 2005

                              _____
                              John T. Copenhaver, Jr.
                              United States District Judge